463 So.2d 1087 (1985)
Cheryl A. HESTER
v.
STATE of Mississippi.
No. 54574.
Supreme Court of Mississippi.
February 13, 1985.
*1088 Samuel H. Wilkins, James O. Nelson, II, Wilkins, Ellington & James, Jackson, for appellant.
Bill Allain, Atty. Gen. by Carolyn B. Mills, Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the Court:

I.
A Rankin County jury convicted Cheryl A. Hester of the capital murder of Harley Winn, who was found stabbed to death in the woods near a trailer park in Pearl, Mississippi. The jury sentenced Hester to life imprisonment. Of the several points she raises on appeal, we address only the issue of the validity of the search warrant and whether the evidence presented by the state was legally sufficient to support a verdict of guilty. The investigation leading to Hester's arrest will first be reviewed to give an overview; then the evidence and testimony adduced at trial will be examined at length.
About 6:45 p.m., on June 4, 1982, members of the Pearl police department were called to investigate a dead body found in the woods in an unused part of a trailer park off Highway 80 in Pearl. The victim, an elderly man, was identified from cards in his wallet as Harley Winn. He died of multiple stab wounds to the neck and torso. The time of death was fixed at between 4:00 p.m. and 6:00 p.m. Winn's wallet contained no money and his pants pockets had been turned inside out with change scattered about the body. A trail of blood stretched between the road and the body and the leaves along this trail had been disturbed.
Investigation of Winn's recent whereabouts led police to Ernie's bar on West Capitol Street, Jackson. A waitress recalled seeing Winn in the company of a woman who had recently given blood. At the Alpha Plasma Center police were given the defendant's name based on the description by the waitress at Ernie's. Another waitress, Linda Pigg, told police she had seen Winn leave the bar with a woman about 4:00 p.m. the day of the murder. Ms. Pigg saw the same woman return alone to the bar about 6:00 p.m. in a disheveled condition and in a hurry to get her friends to leave with her.
Police obtained a warrant on July 7, 1982, to search the mobile home occupied by Hester and her boy friend, Lavon Murray, for a knife or similar weapon thought to be the murder weapon. Hester was arrested and a long blade folding knife was seized from the basket in the living room. A crime lab analysis of the knife showed only traces of blood, too minute to even type as human. A second search warrant was issued on July 11, 1982, to seize a five-gallon pail of water near the knife, but no trace of blood could be located in the water.

II.
Hester challenges the admissibility of the knife on the basis that the justice court judge was not presented with sufficient facts to support a finding of probable cause to issue the search warrant. Justice Court Judge Blaine was given a sworn affidavit by investigating officer Manning and Mississippi Highway Patrol investigator Virgil Luke, which reads:
Harley M. Winn, white, male age 61 was found murdered at Hillard Trailer Park in the City of Pearl, Rankin County. The *1089 cause of death was established as multiple stab wounds. The body was found June 4, 1982 at 6:45 PM.
On June 4, 1982 a Vonda Odom, employed at Ernie's Bar on Capitol Street in Jackson, Ms. did witness Harley M. Winn leaving the bar with a white female, later known to be Cheryl A. Hester at about 4:00 P.M.
The reason Ms. Odom knew that it was 4:00 PM when the subjects left the bar, was because she gets off work at 4:00 P.M. When the subject Cheryl A. Hester returned to the bar at approximately 6:00 Pm. Linda Smith noticed that Cheryl A. Hester came in alone. Also the manager, Bob Wilson of Ernie's Bar, alos (sic) witnessed Cheryl returning at 6 PM. Mr. Winn and Ms. Hester had left the bar in a car being driven by Ms. Hester. The Coroner, MJimmy Roberts (sic) and Dr. Galvez of University Medical Center affixed the time of death as between 4 and 6:00 P.M.
Investigators Manning and Luke also gave sworn oral testimony of the results of Manning's investigation. Manning was the only officer with direct knowledge of the witnesses' testimony. Luke related under oath the facts that Manning had developed and let Manning fill in the details. The written affidavit was only a summary of what the officers told Judge Blaine.
Manning said that the waitress Pigg saw Hester return alone to Ernie's about 6:00 p.m., looking as if she had been in a scuffle with her hair sticking up and with leaves and grass in her hair. Pigg told Manning that Hester told her friends, "Let's go, we've got to get out of here." Manning told the judge that Winn had been seen earlier flashing a wad of money around in Ernie's. Manning said that, earlier, waitress Odom saw Winn apply ice to Hester's arm to stop bleeding where she had given blood at a blood bank. Manning told the judge that Winn had been found with both front pockets pulled out, where he usually carried his money.
Investigator Luke added that Hester and Murray had befriended Winn to the point where Winn was spending his money on them. When this reached an extreme, Winn dropped them and avoided them for two weeks. The day before the murder, the three began to associate together again.
Hester focuses upon three discrepancies which developed at the suppression hearing to conclude that probable cause was not shown. First, Manning admitted that none of his witnesses saw Winn drive away from Ernie's in Hester's car, contrary to the affidavit. Second, Luke said that the judge was shown a photograph of Winn missing one shoe and sock, when in fact the photograph shows both Winn's shoes and socks were on. Third, while Manning and Luke positively recalled telling Judge Blaine that Hester returned looking like she had been in a fight and had leaves in her hair, Judge Blaine could only recall being told she was "ruffled up a little".
The written affidavit, standing alone, did not, in the trial judge's, or our own, opinion establish probable cause to issue the search warrant. Hester concedes, as she must, that affidavits insufficient on their face, may be supplemented by sworn oral testimony to show sufficient facts to establish probable cause. Wilborn v. State, 394 So.2d 1355, 1357 (Miss. 1981); Read v. State, 430 So.2d 832, 834-35 (Miss. 1983); Lee v. State, 435 So.2d 674, 677 (Miss. 1983). Hester contends that Judge Blaine relied upon the disproven facts about Hester's car and Winn's shoe and the embellishment by the officers as to Hester's condition when she returned to issue the search warrant.
Probable cause for the issuance of a search warrant exists when the facts and circumstances in a given situation are sufficient to warrant a man of reasonable caution to believe that seizable objects are located at the place to be searched. Lee v. State, 435 So.2d 674, 676 (Miss. 1983). The information regarding Winn's death was either directly observed or relayed by the coroner's office to officer Manning. The evidence that Hester had left Ernie's with Winn and returned alone in a disheveled *1090 and upset condition was from personal observations of the waitresses at Ernie's, who were interviewed by Manning. The trial judge was persuaded that probable cause to search Hester's trailer was shown from the fact that Winn died in a wooded area surrounded by leaves, in the interval between his departure with Hester from Ernie's and her return to the bar alone because she appeared to have been in a fight and had leaves or grass in her hair, and she urged her friends to leave immediately.
Although this case involves named witnesses, not confidential informants, we deem it significant to recall the analysis in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), quoted in Lee v. State, 435 So.2d at 676:
[T]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... concluding" that probable cause existed. .. .
We point out that the waitresses' statements were based upon personal observations which were verified in part by the police investigation. Officer Manning learned from the Alpha Plasma Center that Hester had given blood on the afternoon of the murder, as Ms. Odom recalled. While no direct corroboration was shown to support Ms. Pigg's personal observation about Hester's condition on her return to Ernie's, the trial judge was not faced with an unnamed informant but a specific witness. We conclude that the fact that the trial judge was told that Hester returned to Ernie's in an upset condition, looking like she had been in a fight with some ground matter in her hair, forms a substantial basis for the issuance of a search warrant since it would warrant a man of reasonable caution in believing she was connected with the death of her recent companion found lying in some scuffled-up leaves, and that a murder weapon would be found in her dwelling.
Although, as Hester points out, no witnesses saw Hester and Winn leave Ernie's in a car, the waitresses saw them leave the bar together. The discrepancy about Winn's shoe is not material to the probable cause determination because it in no way increased or decreased the likelihood that Hester was involved in Winn's death. Finally, the variance between the officer's testimony and Judge Blaine's recollection of what he was told about Hester's appearance on return to Ernie's was noticeable, but Judge Blaine himself remembered being told that she came in hurriedly in a frustrated or upset condition, was probably ruffled up, and was anxious to leave.
In conclusion, we find that, from the oral testimony supplementing the affidavit, even admitting the discrepancies asserted by Hester, Judge Blaine was presented with sufficient reliable facts to support a determination of probable cause for the issuance of the search warrant.
In Powe v. State, 235 So.2d 920 (Miss. 1970), we said that probable cause exists when the
... available evidence makes it reasonable to infer that the particular person not necessarily was, but may have been, one of the offenders, ... .
It is clear therefore, that "probable cause" means less than the evidence which would justify condemnation (Carroll v. United States, supra [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)]), but more than bare suspicion. Locke v. United States, 11 U.S. (7 Cranch) 339 (1813), 3 L.Ed. 364.
Id. at 922-23. Keeping in mind that the quantum of proof to establish probable cause is less than that required to prove guilt beyond a reasonable doubt, see Lanier v. State, 450 So.2d 69, 73 (Miss. 1984); Rome v. State, 348 So.2d 1026, 1027 (Miss. 1977); Evans v. State, 275 So.2d 83, 85 (Miss. 1973); and Powe v. State, 235 So.2d 920, 922-23 (Miss. 1970), we turn to the *1091 question of whether the evidence was sufficient to prove beyond a reasonable doubt that Hester was guilty of the murder of Winn.

III.
Hester's conviction rests upon wholly circumstantial evidence. She contends that the state failed to meet its burden of proving, not only beyond a reasonable doubt but also to the exclusion of every other reasonable hypothesis consistent with innocence, that she stabbed Winn to death and robbed him of his money. In Sanders v. State, 286 So.2d 825 (Miss. 1973), we cautioned that
Each case must be determined from the circumstances shown in the testimony, and of course the facts must consistently point to but one conclusion, that is to say guilt.
Id. at 828. We concluded in Sanders that the state's circumstantial proof was legally insufficient to convict where (1) no one saw the defendant take the victim to the apartment that was the scene of the crime; (2) no one saw the defendant at or near the scene of the crime; (3) no one testified that the defendant closed the door of the apartment in which the infant victim starved to death; (4) no one testified that the defendant had any knowledge that the infant was in the apartment; and (5) the defendant made no confession or admission that he participated in any activity even remotely related to the child's starvation in the apartment. Id. at 827.
As always, when reviewing a jury verdict of guilty we are required to accept as true all the evidence favorable to the state, together with reasonable inferences arising therefrom, to disregard the evidence favorable to the defendant, and if such will support a verdict of guilty beyond reasonable doubt (and, in this case, to the exclusion of every reasonable hypothesis consistent with innocence), then the jury verdict shall not be disturbed. Carroll v. State, 396 So.2d 1033, 1035 (Miss. 1981).
Accepting as true the evidence favorable to the state, together with reasonable inferences, what was this jury shown by the state to prove that Hester stabbed Winn to death?
Ernie's waitress, Linda Pigg, stated that she saw Winn in the bar shortly before 4:00 p.m. and that a woman approached Winn and started talking and "loving on him". Ms. Pigg saw them leave about 4:00 p.m. About two hours later, Ms. Pigg saw the same woman return alone. She said this woman "was a mess ... Her clothes were all dirty, her hair had dirt in it, her face was dirty." The woman urged her friends to leave with her because she had gotten a room. When Ms. Pigg was asked to identify the woman, she at first identified the defendant, then said that the defendant did not look the same as the person she had seen leaving with Winn.
William Wilson, owner of an adjacent antique shop, saw Winn leave with Hester about 4:00 p.m. on the day in question, but he was not present in the bar at 6:00 p.m. He positively identified Hester at trial. Donald Coffin testified that Hester drove up to Ernie's about 6:00 p.m. and asked him to go inside and get her friends, but he refused. Coffin said she was very nervous at the time, and her appearance at trial was different from the day in question. Coffin admitted to drinking before his testimony and on the day in question. The trial court held him in contempt of court for public drunkenness.
To establish motive, the state showed through Mr. Wilson's testimony that Winn had a large roll of money in Ernie's a couple of days before he was killed. Winn tried to change a $100 bill. Wilson said that Winn kept his folding money in his front pocket, not his wallet. Lillian Sutherland, manager of the Noble Hotel where Winn stayed most of the time, recalled that he had cash money within two weeks prior to his death. Sharon Miller, director of Alpha Plasma Center, testified that Hester had sold her blood eleven times in the three months prior to Winn's death, including the day of the murder.
The state also introduced a long folding knife seized from the trailer Hester occupied *1092 with Murray. There was a minute trace of blood on the blade, too small even to type as human. No fingerprints of Hester's were found on the knife. A 5-gallon bucket of water which contained no trace of blood was standing near where the knife was found. Dr. Galvez, a pathologist and psychiatrist, stated that the wounds on Winn's body were consistent with the type of knife seized at Hester's trailer. The depth of the wounds indicated that the assailant was either a weak or drunken man or a woman. In Dr. Galvez' experience, the multiple stabbing inflicted on Winn was typically committed more often by whites than other ethnic groups.
Officer Manning testified that apart from the knife and some keys found outside the trailer, which were clean, the dwelling was filthy. Also a Terry policeman saw Hester and Murray drive into town on the day of her arrest and leaf all the way through a newspaper at a newsstand, then drive away.
Taking together the testimony of the three witnesses from Ernie's with the police investigation and coroner's report, the state proved that Winn was stabbed to death in a distant wooded area with scuffled-up leaves in the interval between his departure with Hester from Ernie's and her return alone in an upset and dirty condition. The state proved that while Hester sold her blood to get money, Winn had been seen two days before his death in Ernie's with a large wad of money, including a $100 bill. Finally, the state proved that the trailer which Hester shared with her friend Murray was filthy but the knife seized from the trailer was clean, except for small traces of an unknown kind of blood.
Hester argues that even if she was seen leaving Ernie's with Winn and returning alone in the manner described, the state failed to offer a scintilla of evidence that she and Winn stayed together after they left Ernie's. She contends that nothing in the state's case made it any more probable that she put Winn in a car, drove him to a trailer park, and stabbed him to death than that she parted ways with Winn outside the bar and returned two hours later, disheveled from some unrelated incident. She emphasizes that no witnesses saw Winn and her get into a car outside of Ernie's, although Coffin saw her drive up in a car at 6:00 p.m. She points out that no witness was offered to show that she and Winn were seen en route to or at the trailer park. Further, nothing at the scene of the crime  fingerprints, footprints, tiretracks, or other tangible evidence  tended to prove that Hester had ever been there. Noticeably absent from Ms. Pigg's testimony at trial was officer Manning's pre-trial assertion that Pigg had seen Hester return to Ernie's with leaves or grass in her hair.
Hester also contends that even if it was true that Winn had a roll of money two days prior to his death, the state completely failed to prove that he had the money on the day he died, or that Hester knew anything about Winn's money. No witness testified at trial, contrary to investigator Luke's pre-trial assertion, that Hester and Murray had been living off Winn's money prior to the murder. She also emphasizes that the police found no money or other property of Winn's when she was arrested three days later and the trailer was searched.
Finally, Hester points out the absence of forensic data connecting the knife with Winn's death. She asserts that the traces of blood could not even be typed as human, much less as Winn's blood. No other indications of blood were on any of Hester's clothes or in the automobile at her trailer. She contends the state failed to prove that the knife belonged to her or that she had used it, pointing out that the knife was found in a common area of the trailer that she shared with Murray. Dr. Galvez' opinions, she asserts, do no more than narrow the likely class of attackers to either weak or drunken men, or women; his testimony does not, according to Hester, identify any particular characteristic of hers other than her gender.
Hester relies upon Sanders v. State, supra, for her position that the circumstantial *1093 proof was legally insufficient to convict. In Sanders, a 16-year-old mother and her baby were found dead in the defendant's Vicksburg apartment. The death of the mother occurred no earlier than a date on which no one had seen the defendant in the Vicksburg area for at least seven days. As noted earlier, the state showed in Sanders that the defendant's apartment was the scene of the crime, but did not prove the defendant was present at the time the mother and child died. We concluded that the proof failed to establish Sanders' guilt beyond a reasonable doubt, much less to the exclusion of every other reasonable hypothesis consistent with innocence, and discharged the defendant. 286 So.2d at 828.
While keeping in mind that each circumstantial evidence case turns on its own facts, and that it is peculiarly within the jury's province to draw reasonable inferences based upon its own experience and common sense, we have previously rejected the concept of guilt by association. Matula v. State, 220 So.2d 833, 836 (Miss. 1969). We said in Matula with regard to the guidelines jurors must follow in drawing inferences from the facts:
Facts not directly proved but which jurors legitimately may infer from other facts which have been proved, are limited to such as naturally follow as being logically connected or related, and which reasonably derive from such established facts.
Id. at 836. In Matula, we discharged a man accused of aiding and abetting a felon because the jury was not permitted to infer, in the absence of all proof, that the felon had confided his guilt to the accused or that he learned it from some other source during their association together.
While we have already held that the fact that Winn died in the interval between his departure from Ernie's with Hester and her return in an upset and disheveled condition formed a substantial basis for issuing a search warrant, because a man of reasonable caution would be warranted in believing that she may have been involved in the crime, a guilty verdict based upon circumstantial evidence must be supported by a much higher degree of proof. As Justice Griffith said in Westbrook v. State, 202 Miss. 426, 432-33, 32 So.2d 251, 252 (1947):
It is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to the height which will exclude every reasonable doubt; that when in any essential respect the state relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis than that the contention of the state is true, and that throughout the burden of proof is on the state. It is our duty here to maintain these principles.
See also, Boyd v. State, 204 So.2d 165 (Miss. 1967); Moore v. State, 188 Miss. 546, 195 So. 695 (1940); Hogan v. State, 127 Miss. 407, 90 So. 99 (1921).
In the case sub judice the verdict must ultimately rest upon the hypothesis that after Hester and Winn left Ernie's, they got in an automobile, drove to the Pearl trailer park, and there engaged in a struggle in which Hester stabbed Winn to death and robbed him. The state urges that this chain of events may be legitimately inferred from the testimony that Hester later drove up to Ernie's and entered in an agitated and dirty condition, and from the long clean folding knife found in the dirty trailer occupied by Hester and Murray.
While the circumstances in this case support the state's hypothesis, they do not actually exclude the reasonable hypothesis asserted by Hester that, outside Ernie's, Hester and Winn parted ways, that Winn met his death at the hands of a third party, and that Hester's condition upon return to Ernie's was due to an unrelated incident. Long ago, in Algheri v. State, 25 Miss. 584 (1853), we stated:
It is always insufficient where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of *1094 truth. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such existence cannot amount to proof, however great the probability may be.
Id. at 589. Such is the situation in the case at bar. The web of circumstances established by the state does not exclude the reasonable hypothesis that a third party, not Hester, was Winn's assailant. The state's evidence connecting Hester to the murder weapon was likewise fatally weak, since the state neither showed a connection between the traces of blood on the knife and Winn's body, nor that the knife belonged to or was used by Hester. Finally, the state failed to prove beyond a reasonable doubt and to the exclusion of any reasonable hypothesis consistent with innocence that Hester robbed Winn. While we are reluctant to set aside a jury verdict of guilty, we are bound by the law to hold the state to the above described level of proof to overcome the presumption of innocence that is the hallmark of our system of criminal justice. Taken in its strongest light, the state's testimony presents no more than a probability that Hester had something to do with the murder of Winn. Probability is not proof beyond every reasonable doubt, as is required in a circumstantial evidence case. We are, therefore, required to reverse Hester's conviction and order that she be discharged.
REVERSED AND APPELLANT DISCHARGED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.